UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH SCHABER, *et al.*, | No. C-06-6007 EMC |
| Plaintiffs, | |
| v. | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** |
| ALLSTATE INSURANCE COMPANY, | |
| Defendant. | |
| _____/ | **(Docket Nos. 30, 40)** |

Currently pending before the Court are (1) Plaintiffs Ralph and Patricia Schabers' motion for summary adjudication and (2) Defendant Allstate Insurance Company's motion for summary judgment or partial summary judgment. In their motion, the Schabers argue that they should be granted summary adjudication on their claim that the losses to their personal property and dwelling are covered, and not excluded, by their Allstate homeowners policy. In its motion, Allstate contends that it is entitled to summary adjudication on this issue. Allstate further asserts that it should be awarded summary judgment on the Schabers' bad faith claim and their prayer for punitive damages.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** the Schabers' motion and further **GRANTS** in part and **DENIES** in part Allstate's motion.

///

///

///

///

# I. FACTUAL & PROCEDURAL BACKGROUND

The evidence presented to the Court in conjunction with the parties' motions reflects as follows.

A.    Insurance Policy

The Schabers live at 20 Syl Dor Lane in Novato, California. *See* P. Schaber Decl. at 1; R. Schaber Decl. at 1. At the time that they purchased their home, they also purchased a "Deluxe Plus Homeowners Policy" from Allstate. *See* P. Schaber Decl. at 1; R. Schaber Decl. at 1. The relevant portions of the policy concern Coverage A and Coverage C. *See* Schabers Decls., Ex. 4 [hereinafter Policy].

Property covered under **Coverage A** includes an insured's dwelling. *See* Policy at 5. According to the policy, Allstate "will cover sudden and accidental direct physical loss to [an insured's dwelling] . . . except as limited or excluded in this policy." *Id.* The relevant exclusion in the instant case is Exclusion No. 22. It provides that Allstate does not cover loss to an insured's dwelling consisting of or caused by:

> 22.    Planning, Construction or Maintenance, meaning faulty, inadequate or defective:
>
> a)    planning, zoning, development, surveying, siting;
> b)    design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> c)    materials used in repair, construction, renovation or remodeling; or
> d)    maintenance;
>
> of property whether on or off the residence premises by any person or organization.

Policy at 7.

Property covered under **Coverage C** includes an insured's personal property. *See* Policy at 8. According to the policy, Allstate "will cover sudden and accidental direct physical loss to [an insured's personal property] . . . except as limited or excluded in this policy, caused by" certain enumerated perils. The stated perils include:

> [13.]    Water or steam that escapes from a plumbing, heating or air conditioning system, an automatic fire protection system, or

2

from a household appliance due to accidental discharge or overflow.

Policy at 10. Like Coverage A, Coverage C provides that Allstate does not cover loss to an insured's personal property caused by or consisting of:

14. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:

   a) planning, zoning, development, surveying, siting;
   b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
   c) materials used in repair, construction, renovation or remodeling; or
   d) maintenance;

of property whether on or off the residence premises by any person or organization.

Policy at 11.

B.    <u>Damage to Dwelling and Personal Property</u>

On July 17, 2005, the Schabers hired SonoMarin Cleaning Services to come to their house on August 6, 2005, and perform certain cleaning. *See* P. Schaber Decl. at 2; R. Schaber Decl. at 2. One of the services offered by SonoMarin was cleaning floors with a Hydra Steamer. *See* P. Schaber Decl. at 2; R. Schaber Decl. at 2. According to the Schabers, Ms. Schaber expressly instructed SonoMarin, both verbally and in writing, not to use the Hydra Steamer on the floors because she believed that application of steam or moisture would necessarily cause damage to the oak and marble floors in her house. *See* P. Schaber Decl. at 2; *see also* R. Schaber Decl. at 2.

At SonoMarin's request, the Schabers were absent from the premises when the work was performed on August 6, 2005. *See* P. Schaber Decl. at 3; R. Schaber Decl. at 3. When the Schabers returned later than evening, the air in the house was moist and humid and the furniture, furnishings, and fixtures were wet and damp. *See* P. Schaber Decl. at 3; R. Schaber Decl. at 3. The Schabers discovered that the finishes on the oak and marble floors had been damaged. *See* P. Schaber Decl. at 3; R. Schaber Decl. at 3. In addition, there was damage to, *inter alia*, finishes on wood furniture, finishes on cabinets, paint finishes on the wall, fabric on upholstered furniture, and oil paintings. *See* P. Schaber Decl. at 3; R. Schaber Decl. at 3. The Schabers observed SonoMarin remove from

3

the premises multiple, full-size plastic garbage cans of towels, soiled with residue which they believe were from the finishes from the furniture, furnishings, and fixtures. *See* P. Schaber Decl. at 3; R. Schaber Decl. at 3.

The Schabers believe that the damage to their dwelling and personal property was caused by SonoMarin's use of the Hydra Steamer on the floors, in disregard of Ms. Schaber's express instructions.[1] *See* P. Schaber at 3; R. Schaber at 3. According to the Schabers, the SonoMarin employee who supervised the work performed on August 6, 2005, advised them that "she had not bothered to read [their] instructions not to wash or use a Hydra Steamer on the floors." P. Schaber Supp. Decl. at 3; R. Schaber Supp. Decl. at 3. Allstate has objected to this evidence as hearsay.

C.    Allstate's Denial of Schaber's Claim

According to the Schabers, on August 22, 2005, they reported the damage to their Allstate agent, David Leslie. *See* P. Schaber at 4; R. Schaber at 4. On the same day, at the request of the Schabers, Mr. Leslie inspected the damage to their dwelling and personal property. *See* P. Schaber Supp. Decl. at 3; R. Schaber Supp. Decl. at 3. The owner of SonoMarin was also present when Mr. Leslie inspected the damage. *See* P. Schaber Supp. Decl. at 3; R. Schaber Supp. Decl. at 3.

Allstate presents a slightly different version of the events. According to Mr. Leslie, some time in 2005, the Schabers told him that their house and personal property had been damaged by SonoMarin and asked him what they should do; he responded that they should pursue a claim against SonoMarin because it was the party that caused the damage. *See* Leslie Decl. ¶ 2. Mr. Leslie claims that "the Schabers said they would do so" and, as a result, he "understood the Schabers did not intent to pursue an insurance claim under their Allstate homeowners policy, and so . . . did not report a claim on their behalf." Leslie Decl. ¶ 2. Mr. Leslie further claims that, "[s]ome time later," the Schabers told him that SonoMarin would be inspecting the damage and invited him to attend the inspection. Leslie Decl. ¶ 3. According to Mr. Leslie, he "agreed to do so as a matter of customer service, not as part of a claim-handling process." Leslie Decl. ¶ 3.

---

[1] Allstate has objected that the Schabers cannot "attest to having personal knowledge regarding what caused the alleged damage while they were away from the premises." Def.'s Obj. at 3.

Thereafter, almost a year passed. According to the Schabers, they learned that Allstate had not assigned a claim number or commenced processing for the reported loss. *See* P. Schaber Supp. Decl. at 3; R. Schaber Supp. Decl. at 3. Therefore, on July 6, 2006, Mr. Schaber recontacted Mr. Leslie. *See* R. Schaber Supp. Decl. at 3. According to Mr. Schaber, "Mr. Leslie apologized for not acting sooner and explained that he had assumed SonoMarin's liability insurance carrier would compensate us for our loss and that Allstate was therefore, 'out of the loop.' Mr. Leslie promised that he would immediately take action and electronically contact the appropriate Allstate department." R. Schaber Supp. Decl. at 3.

Again, Allstate presents a slightly different version of the events. According to Mr. Leslie, some time in 2006, the Schabers contacted him and said that "they wanted to report a claim to Allstate." Leslie Decl. ¶ 4. He "promptly did so on their behalf." Leslie Decl. ¶ 4.

On July 6, 2006, Mr. Schaber received a telephone call from Allstate. *See* R. Schaber Supp. Decl. at 3; *see also* Harris Decl., Ex. A. Mr. Schaber characterizes the call as a "brief" one. R. Schaber Decl. at 3. A document offered by Allstate, described as a computerized loss report, suggests that the conversation was approximately 26 minutes. *See* Harris Decl., Ex. A. Mr. Schaber does not state in his declaration that he informed Allstate that the damage was sustained because SonoMarin had disregarded instructions given by his wife. Nor does the computerized loss report reflect that Mr. Schaber conveyed such information.

Thereafter, Stefanie Harris, an Allstate claims representative, was assigned the Schabers' claim. *See* Harris Depo. at 40. Ms. Harris reviewed the computerized loss report diary (which took less than half an hour) and then called the Schabers on July 7, 2006. *See* Harris Depo at 40-41; Harris Decl. ¶ 4; *see also* R. Schaber Supp. Decl. at 3.

According to Mr. Schaber, the call with Ms. Harris on July 7, 2006, lasted less than ten minutes. *See* R. Schaber Decl. at 3. Ms. Harris testified at her deposition that she could not recall how long the conversation lasted. *See* Harris Depo at 42. Mr. Schaber does not state in his declaration that he informed Ms. Harris that the damage was sustained because SonoMarin had disregarded instructions given by his wife. Ms. Harris's computerized diary entry does not reflect that Mr. Schaber conveyed such information either. *See* Harris Decl., Ex. B. According to Mr.

1    Schaber, no more than an hour and a half later, Ms. Harris called back and said that the claim was

2    being denied.  *See* R. Schaber Supp. Dec. at 4.

3         According to Ms. Harris, after talking with Mr. Schaber, she consulted a manager (on the

4    same day, *i.e.*, July 7, 2006), regarding the Schabers' claim.  *See* Harris Depo. at 48.  The manager

5    referred Ms. Harris to Allstate's coverage counsel.  *See* Harris Depo. at 49, 59.  Ms. Harris contacted

6    coverage counsel Scott Vida (again, on the same day, July 7, 2006)[2] and gave him all of the

7    information that she had obtained from Mr. Schaber.  *See* Harris Depo. at 51, 58.  She did not at that

8    time send him a copy of the claims file for him to review.  *See* Harris Depo. at 62.  According to Ms.

9    Harris, "[w]hen I described the loss to Mr. Vida, he advised me that it fell within the policy's

10   exclusion for faulty maintenance."  Harris Decl. ¶ 5.  Ms. Harris therefore called Mr. Schaber (again,

11   on the same day, July 7, 2006), and informed him that the claim was being denied.  *See* Harris Depo.

12   at 49, 51.

13        On July 9, 2006, Ms. Harris sent a letter to the Schabers, which stated that, "[b]ased on the

14   information obtained and after speaking to Allstate council [sic], the damage caused by the Sono

15   Marin Cleaning Service is not covered."  Schabers' Decls., Ex. 7.  According to Ms. Harris, the

16   Schabers' claim fell within Exclusion No. 22 to Coverage A of the policy.  *See* Schabers' Decls., Ex.

17   7.

18        Shortly after the Schabers received Allstate's letter declining coverage, they retained the

19   services of John Mavredakis to represent them.  *See* P. Schaber Decl. at 5; R. Schaber Decl. at 5.  On

20   July 21, 2006, Mr. Mavredakis wrote to Allstate asking that it reconsider its denial of the Schabers'

21   claim for benefits.  *See* Mavredakis Decl. at 1 & Ex. 8.  In his letter, Mr. Mavredakis asserted that

22   Allstate had delayed for almost a year before responding to the Schabers' claim.  Mr. Mavredakis

23   also stated that "[t]he declination letter did not relate the circumstances of the loss to the provisions

24   of the policy and did not discuss the Schabers' loss under Coverage C at all."  Mavredakis Decl., Ex.

25   8.  Notably, in his letter, Mr. Mavredakis claimed that the Schabers' dwelling and personal property

26

27        [2] In her declaration, Ms. Harris states that she contacted Mr. Vida on July 9, not July 7.  *See*
     Harris Decl. ¶ 5.  However, this is not consistent with her deposition testimony or with Mr. Schaber's
28   testimony.

had been damaged "due to their exposure to steam from a *negligently operated* device used to clean floors." Mavredakis Decl., Ex. 8 (emphasis added). The letter did not reflect that the Schabers had told SonoMarin not to use the steam machine and that SonoMarin had failed to follow those instructions.

According to Ms. Harris, she received Mr. Mavredakis's letter on or about July 26, 2006. *See* Harris Decl. ¶ 6. She forwarded the letter and Allstate's claim file to Mr. Vida for his consideration. *See* Harris Decl. ¶ 6; *see also* Harris Depo at 135.

On August 11, 2006, Mr. Mavredakis filed this lawsuit. *See* Mavredakis Decl. at 2. In the complaint, the Schabers alleged a tortious breach of contract by Allstate. *See* Compl. at 1.

On August 21, 2006, Allstate's coverage counsel, Scott Vida, sent a letter to Ms. Harris, providing the opinion that the damage caused by steam from a negligently operated cleaning machine was not covered under the policy because of Exclusion No. 22 to Coverage A and Exclusion No. 14 to Coverage C. *See* Harris Decl., Ex. E. Under these exclusions, Mr. Vida explained, Allstate is not responsible for covering losses caused by faulty or defective maintenance. "'[M]aintenance' constitutes the act of keeping property in proper condition. We think it cannot reasonably be disputed that the act of cleaning a house constitutes 'maintenance' because cleaning is required to maintain the house in proper condition." Mavredakis Decl., Ex. 9.

On August 30, 2006, Ms. Harris authorized Mr. Vida to send Mr. Mavredakis a letter denying coverage for the Schabers' claim. *See* Harris ¶ 8. That same day, Mr. Vida sent a letter to Mr. Mavredakis, stating the reasons for Allstate's denial of the claim. *See* Mavredakis Decl. at 2 & Ex. 9. In the letter, Mr. Vida stated that Allstate was denying coverage "pursuant to exclusion 22 to Coverage A and exclusion 14 to Coverage C." Mavredakis Decl., Ex. 9.

On April 19, 2007, Mr. Vida sent another letter providing an additional reason for the denial. *See* Mavredakis Decl. at 2 & Ex. 10. According to Mr. Vida, "negligent operation of a steam cleaning machine while maintaining the home . . . is not one of the specified covered perils." Mavredakis Decl., Ex. 10.

## II. <u>DISCUSSION</u>

A.   <u>Legal Standard</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

The defendant may prevail on a motion for summary judgment (where the plaintiff has the ultimate burden of proof) simply by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B.   <u>Breach of Contract</u>

The Schabers contend that Allstate breached the insurance contract by denying coverage for their claim. According to the Schabers, their claim was covered pursuant to Coverage C (personal property) and Coverage A (dwelling) of the insurance policy. Allstate disputes such.

"Because this diversity case arises in California, California law applies." *Allstate Ins. Co. v. Smith*, 929 F.2d 447, 449 (9th Cir. 1991). Under California law, "interpretation of [insurance] policy language is a question of law" and "follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 641, 647 (2003). "The interpretation of a contract . . . is solely a judicial function unless the interpretation turns on the credibility of extrinsic evidence." *American Alternative Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1245 (2006).

"[P]olicy language is interpreted in its ordinary and popular sense and as a laymen would read it and not as it might be analyzed by an attorney or an insurance expert." *E.M.M.I., Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 471 (2004) (internal quotation marks omitted). On the other hand, a dictionary definition of a word "does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context." *MacKinnon*, 31 Cal. 4th at 649.

"If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992). But, if there is ambiguity, the "[a]mbiguity is resolved by interpreting the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation." *E.M.M.I.*, 32 Cal. 4th at 470 (internal quotation marks omitted); *see also Bank of the West*, 2 Cal. 4th at 1264 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.") (internal quotation marks omitted). "If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist." *E.M.M.I.*, 32 Cal. 4th at 470 (internal quotation marks omitted); *see also Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 737 (1993) ("If that principle cannot remove an ambiguity, as when there is no basis for a belief that the insured understood a term in a specific sense, then the ambiguity is construed against the party who caused the uncertainty to exist."). That is, the ambiguity is "resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates." *Merced Mut. Ins. Co. v. Mendez*, 213 Cal. App. 3d 41, 47 (1989) (internal quotation marks omitted). "[S]o long as coverage is available under any reasonable interpretation of an ambiguous clause, the insurer cannot escape liability." *State Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal. 3d 193, 197 (1973). However, "an interpretation in favor of coverage is reasonable only if it is consistent with the objectively reasonable expectations of the insured." *American Alternative*, 135 Cal. App. 4th at 1245.

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *MacKinnon*, 31 Cal. 4th at 648 (internal quotation marks omitted). Language in a contract, however, "must be interpreted as a whole, and in the

circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.* (internal quotation marks omitted); *see also American Alternative*, 135 Cal. App. 4th at 1246 ("Even language that may be plain and clear may be found to be ambiguous when read in the context of the policy and the circumstances of the case . . . ."). *See, e.g.*, *Bank of the West*, 2 Cal. 4th at 1265 (agreeing that the term "unfair competition" in the abstract could refer to statutory claims and not just common law claims; however, in the policy at issue, there was coverage only for damages for advertising injury caused by unfair competition and, "[r]ead in this context, the term 'unfair competition' can only refer to a civil wrong that can support an award of damages"). "Whether contractual language is ambiguous is a question of law . . . ." *American Alternative*, 135 Cal. App. 4th at 1245.

      1.      <u>Coverage C (Personal Property)</u>

Coverage C of the Schabers' homeowners policy covers personal property. Coverage C has two essential parts: "the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 16 (1995). Before the Court considers the exclusions under Coverage C, it examines first the coverage provisions to determine whether the Schabers' claim falls within the policy terms. *See id.* It is the burden on the Schabers, as the insureds, to bring their claim within the basic scope of coverage. *See id.* While "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured," *MacKinnon*, 31 Cal. 4th at 648 (internal quotation marks omitted), "courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage." *Waller*, 11 Cal. 4th at 16 (internal quotation marks omitted).

As noted above, pursuant to Coverage C, Allstate "will cover sudden and accidental direct physical loss to [an insured's personal property] . . . except as limited or excluded in this policy, caused by":

> [13.]    Water or steam that escapes from a plumbing, heating or air conditioning system, an automatic fire protection system, or from a household appliance due to accidental discharge or overflow.

1  Policy at 10.

2          a.      Damage by Hydra Steamer

3          As a preliminary matter, Allstate argues that it should be granted summary judgment because

4  the Schabers do not have any admissible evidence that the damage was caused by a Hydra Steamer.

5  Allstate notes that the Schabers were not actually present during the cleaning by SonoMarin, and it

6  has objected to the Schabers' statements in their declarations that the SonoMarin employee who

7  supervised the work performed on August 6, 2005, advised them that "she had not bothered to read

8  [their] instructions not to wash or use a Hydra Steamer on the floors." P. Schaber Supp. Decl. at 3;

9  R. Schaber Supp. Decl. at 3.

10          The statement of the SonoMarin supervisor does appear to be hearsay. But even if the Court

11  were to disregard that evidence, Allstate is not entitled to summary judgment on this ground. A

12  reasonable inference can be made that a steamer was used to clean based on the Schabers' testimony

13  that, when they returned to their house, the air in the house was moist and humid and the furniture,

14  furnishings, and fixtures were wet and damp, together with the fact that SonoMarin offers cleaning

15  service with a Hydra Steamer. *See* P. Schaber Decl. at 3; R. Schaber Decl. at 3.

16          On the other hand, the Schabers' motion for summary adjudication must be denied because it

17  cannot be conclusively presumed that a steamer was in fact used (at least, based on the evidence

18  submitted). Where the plaintiff has the ultimate burden of proof, it may prevail on a motion for

19  summary judgment only if it affirmatively demonstrates that there is no genuine dispute as to every

20  essential element of its claim. *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458,

21  1462 (9th Cir. 1992). As a matter of law, it cannot be determined at this point what caused the

22  damage to their property. The Schabers' motion is also denied for the reason stated below in Part

23  II.B.1.c, *infra*.

24          b.      Sudden and Accidental Loss

25          Allstate argues that, even if SonoMarin did in fact use a steamer, Allstate is still entitled to

26  summary judgment because there was no sudden and accidental loss to the Schabers' property.

27  According to Allstate, there was no sudden loss because the damage occurred during a deliberate,

28

lengthy cleaning process, and there was no accidental loss because the Schabers intentionally hired SonoMarin to clean.

The phrase "sudden and accidental" as used in insurance policies has been interpreted by the California courts. *See Shell Oil*, 12 Cal. App. 4th at 755 (terms of a sudden and accidental discharge). "An 'accidental' event is both unintended and unexpected . . . ." *Id.* The term "'[a]ccidental' in an insurance policy ordinarily means unintended and unexpected by the insured". *American Alt. Ins. Corp. v. Superior Court*, 135 Cal. App. 4th at 1249 (2006) (defining "accidental" as used in an insurance policy that defined the term "physical damage" as "direct and accidental physical loss or damage"). *Cf. Home Sav. of Am., F.S.B. v. Continental Ins. Co.*, 87 Cal. App. 4th 835, 849-50 (2001) (indicating that, under a standard loss payable clause in which a mortgagee is free of defenses that could be asserted against the debtor, whether a loss is accidental is considered from the viewpoint of the claimant mortgagee and not the debtor).

As for "sudden," the word "necessarily contains a temporal element in addition to its connotation of the unexpected." *Id.* at 754. In the context of insurance policies that provide coverage for sudden and accidental discharge of pollutants, California courts have said that

> "sudden" refers to the pollution's commencement and does not require that the polluting event terminate quickly or have only a brief duration. If a sudden and accidental discharge continues for a long time, at some point it ceases to be sudden or accidental. Still, a sudden and accidental discharge of a dangerous pollutant could continue unabated for some period because of a negligent failure to discover it, technical problems or a lack of resources that delay curtailment, or some other circumstance. Liability from such an event could well be covered.

*Id.* at 756.

Taking into account the above, Allstate's position cannot be sustained. First, viewing the evidence in Plaintiffs' favor, while the Schabers did intentionally hire SonoMarin to clean, they did not instruct SonoMarin to use a steamer; in fact, Ms. Schaber asserts that she expressly instructed SonoMarin, both verbally and in writing, not to use the Hydra Steamer. Even if she had not so expressly instructed SonoMarin, the damage, if caused by the steamer, was not intended or expected

by the Schabers. Thus, for purposes of this motion, the loss to the Schabers' personal property was "accidental" as that term is used in Coverage C.

Second, under the evidence viewed in the Schabers' favor, the loss here occurred over the span of only a few hours, and therefore it cannot be described as having arisen gradually. Allstate has not cited any authority that a loss taking place over the course of a few hours -- as opposed to, *e.g.*, months or years -- is not "sudden." *Compare Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417, 424 (7th Cir. 2005) (discussing whether there was loss of use of property arising out of sudden and accidental physical injury; concluding that there was no sudden physical injury to a food product because the facts were consistent with a "gradual deterioration" over a period of a few months).

The Court therefore rejects Allstate's contention that the loss at issue in the instant case if caused by the steamer was neither accidental nor sudden.

c.     Household Appliance; Accidental Discharge

Allstate contends still that, even if a steamer were in fact used and the loss was both sudden and accidental, it should still be awarded summary judgment because coverage under Coverage C in this case extends only to loss to personal property caused by "[w]ater or steam that escapes from a plumbing, heating or air conditioning system, an automatic fire protection system, or from a household appliance due to accidental discharge or overflow," Policy at 10. The parties dispute whether a commercial steamer such as the Hydra Steamer is a "household appliance." Although the Court is inclined to find the commercial steamer, while perhaps an "appliance," is not a "household" appliance, it need not resolve that issue. The policy covers only losses caused by water or steam that escapes from a household appliance due to an "accidental discharge or overflow," Policy at 10. Here, there was no "accidental discharge" of steam because the intended operation of the steamer is to discharge steam.

According to the Schabers, the discharge was accidental because "'[a]ccidental in an insurance policy ordinarily means unintended and unexpected by the insured.'" Mot. at 10[3] (quoting

---

[3] For convenience, the Court refers to the Schabers' motion for summary adjudication as the motion; Allstate's opposition and cross-motion as the opposition; the Schabers' reply and opposition to the cross-motion as the reply; and Allstate's reply in support of the cross-motion as the sur-reply.

*American Alt.*, 135 Cal. App. 4th at 1249). This argument is not convincing. To be sure, as noted above, whether a *loss* is accidental is determined from the insured's point of view. *See id.* at 1242-43 (considering the term "accidental" with respect to a policy that defined the term "physical damage" as "direct and accidental physical loss or damage"). But here the issue is not whether there was an accidental loss within the broad provisions of coverage, but whether the *discharge* of steam was accidental under the specific stated peril. As Allstate contends, "the term 'accidental' cannot be read in a vacuum, but must be interpreted in the context of the surrounding language." Opp'n at 10-11. Coverage C specifies that the loss must be caused by:

> [13.] Water or steam that escapes from a plumbing, heating or air conditioning system, an automatic fire protection system, or from a household appliance due to accidental discharge or overflow.

Policy at 10. The context above establishes that water or steam should not ordinarily "escape[]" from the household appliance. In other words, an accidental discharge from a household appliance would be a discharge that one would not expect to come from the household appliance. The term "accidental" used to describe "discharge" when viewed in context of the stated peril has a more specific meaning than when used to describe "loss" in the general coverage section.

Accordingly, with respect to coverage under Coverage C (personal property), the Court grants Allstate's motion for summary judgment. Even assuming the Schabers' version of events, the discharge of steam from the steamer was not an "accidental" discharge within the meaning of stated peril No. 13.

2.      Coverage A (Dwelling)

As noted above, under Coverage A, Allstate "will cover sudden and accidental direct physical loss to [an insured's dwelling] . . . except as limited or excluded in this policy." Policy at 5. Allstate argues that the loss to the Schabers' dwelling was not sudden and accidental for the same reasons as discussed above with respect to Coverage C. For the reasons discussed above, the Court does not agree. The Court concludes that, if the loss were in fact caused by the steam cleaner then, as a matter of law, the loss was both sudden and accidental. *See In re Marriage of Iberti*, 55 Cal. App. 4th 1434, 1439 (1997) ("When, as here, no conflicting extrinsic evidence is offered of an

interpretation as to which the language of a marital settlement agreement is reasonably susceptible, and the facts are otherwise undisputed, we apply the unambiguous contract terms to the undisputed facts as a matter of law.").

The Court therefore turns to the issue of whether the Schabers' claim was properly denied based on an exclusion clause. Under California law, policy exclusions are strictly construed. "[T]he burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause must be *conspicuous, plain and clear*." *E.M.M.I.*, 32 Cal. 4th. at 471 (emphasis in original; internal quotation marks omitted).

In the instant case, the relevant exclusion clause is No. 22, which provides that Allstate does not

> cover loss to the property described in Coverage A . . . consisting of or caused by:
>
> . . . .
>
> 22.    Planning, Construction or Maintenance, meaning faulty, inadequate or defective:
>
> a)    planning, zoning, development, surveying, siting;
> b)    design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> c)    materials used in repair, construction, renovation or remodeling; or
> d)    maintenance;
>
> of property whether whether on or off the residence premises by any person or organization.

Policy at 7. According to Allstate, it should be granted summary judgment because the Schabers' loss was caused by faulty workmanship and maintenance. Allstate emphasizes that the "purpose of [the] exclusion [clause] is to shift responsibility to the contractor and its [insurer], rather than the homeowner's insurer, thereby incentivizing insureds to hire competent and bonded contractors." Opp'n at 17-18.

As a preliminary matter, the Court rejects Allstate's contention that the situation here can be characterized as faulty "workmanship." In *Allstate Insurance Co. v. Smith*, 929 F.2d 447 (9th Cir. 1991), the Ninth Circuit held that this phrase is ambiguous, based in part on the dictionary

definitions of "workmanship." *See id.* at 449-50. The Court concluded the phrase "faulty workmanship" could mean either the flawed quality of a finished product or a flawed process. Because of the ambiguity, the court applied the construction most favorable to the insured, which in that case was flawed product. *See id.* at 450. In the instant case, the phrase "faulty workmanship" is likewise ambiguous. Workmanship can reasonably be construed to refer a finished product or a process. Because of the ambiguity, the Court applies the construction most favorable to the Schabers, *i.e.*, flawed product. Here, there was no flawed product. SonoMarin did not make or create any product; all that it did was clean.[4] The issue therefore is whether the "faulty maintenance" exclusion applies.

> a.  Loss to Parts of Dwelling Other than Floors

According to the Schabers, damage to parts of their dwelling other than the floors cannot be excluded because the exclusion clause provides that, if there is faulty maintenance of "property," only damage to *that* property is excluded. Here, if there was "maintenance" (if any, *see* Part II.B.2.b, *infra*), it was to the floors only. Therefore, only damage to the floors can be excluded, and not damage to other parts of the dwelling which were not cleaned but were subject to collateral damage. *See* Mot. at 19 ("Because the Hydra Steamer was not used on any part of the dwelling other than the floors, the losses to the other parts of the dwelling are not excluded by the faulty process of work on the floors.").

The Schabers have advanced a fair reading of the exclusion clause. The exclusion's reference to faulty maintenance "of property" is ambiguous. It can reasonably be construed to mean either (1) any property or (2) the property worked on. The ambiguity must be construed against Allstate. *Allstate Ins.* Co., 929 F.2d at 450. Allstate fails to respond this point adequately in their briefs. *See* Opp'n at 17. The Court therefore agrees that damage to the Schabers' dwelling other than the floors is not excluded under Coverage A (dwelling). If the loss were in fact caused by the

---

[4] Allstate tries to argue that there was a flawed product here because "plaintiffs supposedly were left with discolored and scratched property rather than cleaned property." Opp'n at 15. But a product generally is something that is created or produced.

1    steam cleaner, then the loss to the dwelling (not personal property) other than the floors is covered

2    under Coverage A.

3              b.    <u>Loss to Floors</u>

4         The Schabers also argue that the damage to the floors of their dwelling cannot be excluded

5    because the exclusion clause covers only faulty maintenance of property and here there was no

6    "maintenance" of the floors.  As to the interpretation of "maintenance," the Schabers accept, at least

7    for purposes of summary judgment, the definition provided by Allstate's coverage counsel -- *i.e.*, the

8    act of keeping property in proper condition.  Allstate's current counsel supplies the definition as

9    "'the labor of keeping something (as buildings or equipment) in a state of repair or efficiency:

10   CARE, UPKEEP.'"  Opp'n at 15 (quoting Webster's Third New International Dictionary).

11        The question is whether or not SonoMarin's conduct in cleaning the floors was

12   "maintenance."  According to the Schabers, the "necessarily destructive and prohibited act of hydra

13   steaming the oak and marble floors" would not be keeping the floors in proper condition and thus

14   not maintenance. Mot. at 19.  But this argument misses the point.  Whether the steaming was

15   unauthorized and thus prohibited is irrelevant.  The lack of authorization may go to the issue of the

16   loss being accidental (*i.e.*, unintended and unexpected) but not to whether the conduct was

17   "maintenance."  Similarly, whether or not the steaming was necessarily destructive goes to the issue

18   of whether the cleaning process was "faulty" or "defective."  Instead, the precise issue is whether the

19   conduct of cleaning the floors is "maintenance" within the meaning of exclusion clause No. 22.  If

20   so, then using steam to clean a wood floor would constitute "faulty" maintenance.

21        Allstate contends that cleaning undisputedly is an act of maintenance.  *See* Sur-Reply at 8.

22   The Court agrees that the word "maintenance" taken in the abstract could encompass cleaning.

23   Moreover, the Court agrees that the word "maintenance" considered in the context of home upkeep

24   could encompass cleaning the floors.  But the threshold question is whether the term "maintenance"

25   as used in Exclusion 22 to Coverage A is ambiguous.  The Court, as previously noted, must look at

26   how the term is used in the context of the insurance policy as "[e]ven language that may be plain and

27   clear may be found to be ambiguous when read in the context of the policy and the circumstances of

28

the case." *American Alternative*, 135 Cal. App. 4th at 1246. In the policy at issue, the word "maintenance" appears in the following context:

    a)      planning, zoning, development, surveying, siting;

    b)      design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    c)      materials used in repair, construction, renovation or remodeling; or

    d)      maintenance; . . . .

Policy at 7. This context suggests that "maintenance" is an act akin to development, repair, or construction, and not cleaning. The context at least gives rise to an ambiguity as to the meaning of "maintenance." That ambiguity further resides in the fact that cleaning a floor (as opposed to recoating it with sealer or other protective coating) might be reasonably interpreted as not keeping the floor "in a state of repair" as defined by Webster's, *supra*. The ambiguity of "maintenance" in exclusion clause No. 22 must be construed against Allstate, particularly since an exclusion must be in "clear and unmistakable language." *E.M.M.I.*, 32 Cal. 4th at 471. So construed, steam cleaning the wood floor would not constitute faulty "maintenance" under exclusion clause No. 22.

Accordingly, the Court denies Allstate's motion for summary judgment with respect to damage to the floors under Coverage A (dwelling). The Court, however, must also deny the Schabers' motion because they have not conclusively established what caused the damage to the dwelling. In short, although the exclusion clause No. 22 would not apply to steam cleaning, the Schabers need to establish how the floors were damaged.

    3.    <u>Summary</u>

On the breach of contract claim, the Court grants Allstate's motion and denies the Schabers' with respect to damage to personal property under Coverage C. The Court denies both the Schabers' and Allstate's motion with respect to damage to the dwelling (floors and other parts of the dwelling) under Coverage A.

C.    <u>Bad Faith</u>

Allstate has also moved for summary judgment on the Schabers' claim of bad faith. "In addition to the duties imposed on contracting parties by the express terms of their agreement, the law

United States District Court

For the Northern District of California

implies in every contract a covenant of good faith and fair dealing. The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. The precise nature and extent of the duty imposed by such an implied purpose will depend on the contractual purposes." *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 817 (1979). "[A]n insurer's responsibility to act fairly and in good faith in handling an insurer's claim 'is *not* the requirement mandated by the terms of the policy itself -- to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities.'" *California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 54 (1985).

The Schabers have claimed that Allstate violated its duty of good faith and fair dealing by (1) unreasonably delaying investigation of the Schabers' claim and (2) unreasonably denying payment without thoroughly investigating.[5] Allstate argues that it should be awarded partial summary judgment on the issue of bad faith because, as a matter of law, it acted reasonably.

1.    Unreasonable Delay in Investigating Claim

The Schabers contend first that Allstate violated the covenant of good faith and fair dealing by unreasonably delaying investigation of their claim. Under California law, it is clear that an insurer can be held liable for bad faith if it unreasonably delays in paying or fails to pay benefits. *See Rappaport-Scott v. Interinsurance Exchange of the Automobile Club*, 146 Cal. App. 4th 831, 837 (2007). But it is not clear whether, under California law, an insurer can be held liable for an unreasonable delay in investigation. In other words, arguably, a delay in payment may be a different situation from a delay in investigation. For instance, if ultimately it is determined that a coverage was justifiably denied, it is not clear that delay in initiating investigation which ultimately led to that denial is actionable. Neither party has addressed this distinction in their briefs. However, assuming that an insurer can be held liable for the latter situation, *cf. McCormick v. Sentinel Life Ins. Co.*, 153 Cal. App. 3d 1030, 1050-51 (1984) (rejecting the argument that a "bad faith claim is negated simply

---

[5] The Schabers have not argued that Allstate breached its duty of good faith and fair dealing simply because it denied their claim. The Schabers' cause of action for bad faith is tied to the investigation by Allstate.

1   because benefits were never *formally* denied") (emphasis in original), the Court concludes that

2   summary judgment in favor of Allstate is not proper because there is a genuine dispute as to whether

3   Allstate's delay in investigating the claim was reasonable.

4        Under the Schabers' version of the events, they reported the loss to Mr. Leslie, their Allstate

5   agent, on August 22, 2005.  However, Mr. Leslie took no action on the claim for almost a year.

6   When Mr. Schaber recontacted Mr. Leslie on July 6, 2006, "Mr. Leslie apologized for not acting

7   sooner and explained that he had assumed SonoMarin's liability insurance carrier would compensate

8   us for our loss and that Allstate was therefore, 'out of the loop.'  Mr. Leslie promised that he would

9   immediately take action and electronically contact the appropriate Allstate department."  R. Schaber

10  Supp. Decl. at 3.  Viewing this evidence and taking all reasonable inferences therefrom in the

11  Schabers' favor, there was a purposeful decision by Mr. Leslie to hold off processing the Schabers'

12  claim to see if SonoMarin would cover the loss.  Thus, according to the Schabers, Allstate

13  purposefully decided to wait until after the conclusion of the Schabers' dealings with SonoMarin

14  before it decided to pay or deny their first party claim.  *See Silberg v. California Life Ins. Co.*, 11

15  Cal. 3d 452 (1974) (holding that, as a matter of law, the insurer violated its duty of good faith and

16  fair dealing when it chose to wait until worker's compensation proceeding was concluded before it

17  paid or denied the plaintiff's claim).

18       Under Allstate's version of the events, the Schabers did tell Mr. Leslie about the loss, but

19  they also said that they would pursue a claim against SonoMarin as it was the party that caused the

20  damage.  As a result, Mr. Leslie "understood the Schabers did not intend to pursue an insurance

21  claim under their Allstate homeowners policy, and so . . . did not report a claim on their behalf."

22  Leslie Decl. ¶ 2.  Only later, when the Schabers contacted him in 2006 and said that "they wanted to

23  report a claim to Allstate" did Mr. Leslie "promptly" report a claim on their behalf.  Leslie Decl. ¶ 4.

24       In other words, according to Allstate, either there was no delay in investigating since the

25  Schabers decided initially not to file a claim, or at least was a simple mistake in communication.  In

26  *California Shoppers*, 175 Cal. App. 3d at 54-55, (the court held that, "before an insured can be

27  found to have acted tortiously, *i.e.*, in bad faith, in refusing to bestow policy benefits, it must have

28  done so 'without proper cause'" and that "a *mistaken withholding* of policy benefits, at least where,

1   as here such mistake (as to the insured's identity and not as to the matter of coverage) has been

2   contributed to by the very party claiming those policy benefits, is consistent with observance of the

3   implied covenant of good faith and fair dealing because the mistake supplies the 'proper cause.'"

4   (emphasis in original).  Under Allstate's version of events, no breach of the implied covenant

5   occurred.

6        This is a genuine dispute of material fact for the trier of fact to resolve.  Accordingly,

7   Allstate's motion for summary judgment with respect to this part of the Schabers' bad faith claim is

8   denied.

9        2.    <u>Unreasonable Denial of Payment Without Thorough Investigation</u>

10       The Schabers further contend that Allstate violated the covenant of good faith and fair

11  dealing by unreasonably denying payment without conducting a thorough investigation of their

12  claim.  As noted above, on July 6, 2006, Mr. Schaber received a telephone call from Allstate

13  regarding the Schabers' claim.  *See* R. Schaber Supp. Decl. at 3; *see also* Harris Decl., Ex. A.  Mr.

14  Schaber characterizes the call as a "brief" one.  R. Schaber Decl. at 3.  A document offered by

15  Allstate, described as a computerized loss report, suggests that the conversation was approximately

16  26 minutes.  *See* Harris Decl., Ex. A.

17       Thereafter, Ms. Harris, an Allstate claims representative, was assigned the Schabers' claim.

18  *See* Harris Depo. at 40.  Ms. Harris reviewed the computerized loss report diary (which took less

19  than half an hour) and then called the Schabers on July 7, 2006.  *See* Harris Depo at 40-41; Harris

20  Decl. ¶ 4; *see also* R. Schaber Supp. Decl. at 3.  According to Mr. Schaber, the call with Ms. Harris

21  on July 7, 2006, lasted less than ten minutes.  *See* R. Schaber Decl. at 3.  Ms. Harris testified at her

22  deposition that she could not recall how long the conversation lasted.  *See* Harris Depo at 42.

23  According to Mr. Schaber, no more than an hour and a half later, Ms. Harris called back and said

24  that the claim was being denied.  *See* R. Schaber Supp. Dec. at 4.  There does not appear to be a

25  dispute that, during that hour and a half, Ms. Harris consulted with a manager and then coverage

26  counsel, Mr. Vida.

27       Under California law, an insurer may breach the duty of good faith and fair dealing by

28  unreasonably denying a claim for benefits.  In *Egan*, the California Supreme Court "made clear

[that] the standard of reasonableness may require an insurer to conduct an insurer to conduct an independent investigation of a claim." *McCormick v. Sentinel Life Ins. Co.*, 153 Cal. App. 3d 1030, 1047 (1984). *See also Egan*, 24 Cal. 3d at 817 (noting that "an insurer may breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claim").

There is no real dispute that the investigation conducted by Allstate was relatively rapid. However, as a matter of law, the investigation was not done in bad faith. Even within that short timeframe, Allstate learned about all the material facts needed to make a decision, *i.e.*, that damage was sustained to the Schabers' home and personal property as a result of steam cleaning by a third party. That the steam cleaning was not authorized by the Schabers -- and was done contrary to the express instructions of Ms. Schaber – was not material to Allstate's decision to deny the claim. Allstate denied coverage based on the exclusion clauses (that is, damage was caused by faulty maintenance) and, for Coverage C, the loss was not caused by one of the stated perils.

Even if the fact that the steam cleaning was specifically unauthorized were relevant, that is a point to which the Schabers should have alerted Allstate because that was information within their knowledge. *Cf. McCormick*, 153 Cal. App. 3d at 1046 (noting that the conduct of the insured cannot be ignored -- *e.g.*, "[i]n most instances the conditions of the insurance require an insured to submit proof of loss [and] [t]he insurer relies on this information in its evaluation of the claim"). As noted above, there is no evidence in the record that Mr. Schaber (or for that matter Ms. Schaber) informed Allstate that SonoMarin had disregarded instructions given by his wife. In his declaration, Mr. Schaber only stated that Ms. Harris "did not ask if we had instructed SonoMarin not to use the Hydra Steamer," R. Schaber Supp. Decl. at 4; *see also* Reply at 20. There is no evidence: (1) why Ms. Harris should have asked that question (*e.g.*, that she should have been on notice that this was an issue), and (2) why Mr. Schaber did not tell Mr. Harris of that fact on his own. In short, based on the information supplied by the Schabers, there was no need for Allstate to conduct a further investigation. *Cf. Hydro Systems, Inc. v. Continental Ins. Co.*, 929 F.2d 472, 476 (9th Cir. 1991) (noting that "where the complaint does not plead facts raising potential liability there is no duty to investigate the lawsuit").

1     Notably, even after the Schabers retained the services of Mr. Mavredakis, Mr. Mavredakis

2  never communicated to Allstate that the damage occurred because SonoMarin had disregarded

3  instructions given by Ms. Schaber.  Rather, in his letter to Allstate of July 21, 2006, Mr. Mavredakis

4  claimed that the Schabers' dwelling and personal property had been damaged "due to their exposure

5  to steam from a *negligently operated* device used to clean floors."  Mavredakis Decl., Ex. 8

6  (emphasis added).  Similarly, in the complaint that Mr. Mavredakis filed on August 11, 2006, there

7  was no allegation that the damage occurred because SonoMarin had disregarded instructions given

8  by Ms. Schaber.

9     Plaintiffs have failed to demonstrate the investigation was inadequate.  The Court therefore

10  grants Allstate's motion for summary judgment with respect to this part of the Schabers' bad faith

11  claim.

12     3.     Summary

13     Allstate's motion for summary judgment with respect to the delay in investigating is denied.

14  However, its motion with respect to the inadequate investigation is granted.

15  D.     Punitive Damages

16     Finally, Allstate moves for summary judgment with respect to punitive damages on the bad

17  faith claims.  Because the Court has dismissed the claim that there was an inadequate investigation,

18  *see* Part II.C.2, *supra*, the Court need only address whether punitives may be available for the claim

19  that the investigation was unreasonably delayed.

20     Under California Civil Code § 3294,

21          [i]n an action for the breach of an obligation not arising from contract,
            where it is proven by clear and convincing evidence that the defendant
22          has been guilty of oppression, fraud, or malice, the plaintiff, in
            addition to the actual damages, may recover damages for the sake of
23          example and by way of punishing the defendant.

24  Cal. Civ. Code § 3294(a).  Moreover,

25          [a]n employer shall not be liable for damages pursuant to subdivision
            (a), based upon acts of an employee of the employer, unless the
26          employer had advance knowledge of the unfitness of the employee and
            employed him or her with a conscious disregard of the rights or safety
27          of others or authorized or ratified the wrongful conduct for which the
            damages are awarded or was personally guilty of oppression, fraud, or
28          malice.  With respect to a corporate employer, the advance knowledge

23

1    and conscious disregard, authorization, ratification or act of
2    oppression, fraud, or malice must be on the part of an officer, director,
     or managing agent of the corporation.

3  *Id.* § 3294(b).

4          According to Allstate, it should be granted summary judgment with respect to the Schabers'

5  claim for punitive damages because there is no clear and convincing evidence of oppression, fraud,

6  or malice and, further, there is evidence that an officer, director, or managing agent of the

7  corporation authorized or ratified the wrongful conduct. The Schabers have not made any argument

8  or pointed to any evidence as to how there was corporate authorization or ratification with respect to

9  the alleged unreasonable delay in investigating the claim. *See* Reply at 25 (discussing corporate

10 authorization or ratification with respect to the alleged inadequate investigation only). Therefore,

11 summary judgment in favor of Allstate with respect to punitive damages on this claim is proper.

12                          **III.    CONCLUSION**

13         For the foregoing reasons, the parties' motions are granted in part and denied in part. More

14 specifically, the Court grants Allstate's motion for summary adjudication with respect to: (1) breach

15 of contract for denial of coverage under Coverage C (personal property); (2) breach of the covenant

16 of good faith and fair dealing regarding the alleged inadequate investigation; and (3) punitive

17 damages. The Court while having interpreted the terms "accidental" and "sudden" loss under

18 coverage A, and "property" and "maintenance" in exclusion clause No. 22 in the Schabers' favor,

19 nonetheless denies their motion for summary judgment as there are disputed factual issues. The

20 issues remaining for trial are: (1) breach of contract for denial of coverage under Coverage A, and

21 (2) breach of the covenant of good faith and fair dealing regarding the delay in investigation.

22         This order disposes of Docket Nos. 30 and 40.

23

24         IT IS SO ORDERED.

25

26 Dated:  December 18, 2007

27                                                            _____

28                                                            EDWARD M. CHEN
                                                             United States Magistrate Judge

24