UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RALPH SCHABER, *et al.*,

        Plaintiffs,

        v.

ALLSTATE INSURANCE COMPANY,

        Defendant.
_____/

No. C-06-6007 EMC

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        Plaintiffs Ralph and Patricia Schaber initiated this lawsuit in state court on August 11, 2006. *See* Docket No. 1. In their complaint, they alleged that Defendant Allstate Insurance Co., from whom they had purchased a homeowners insurance policy, had breached that policy by denying coverage for damage to their home (Coverage A of the policy) and to their personal property inside the house (Coverage C of the policy). The Schabers also alleged that Allstate had violated its duty of good faith and fair dealing. Allstate subsequently removed the complaint to this Court on the basis of diversity jurisdiction.

        In September 2007, the Schabers moved for partial summary judgment and thereafter Allstate cross-moved for summary judgment or partial summary judgment. The Court denied the Schabers' motion in its entirety and granted in part and denied in part Allstate's motion. The Court's order left for trial only two issues: (1) whether damage to the Schabers' house was covered under Coverage A of the policy, and (2) whether Allstate had breached the covenant of good faith and fair dealing by unreasonably delaying investigation of the Schabers' claim under the policy.

A bench trial was held on the remaining issues, commencing on March 3, 2008, and ending on March 10, 2008. The Court heard live testimony and admitted documentary evidence. Having considered all the evidence and the post-trial submissions of counsel, the Court hereby makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Plaintiffs Ralph and Patricia Schaber reside in Novato, California, and own a house located at 20 Syl Dor Lane. The house was built in 1989 and was purchased by the Schabers in 1998. It is a two-story house with over 5,000 square feet and consists of six bedrooms, four bathrooms, a foyer, a kitchen, a mud room, a breakfast area, a butler's pantry, a "great room," a snuggery, a parlor, and a dining room. The house contains a substantial amount of woodwork: hardwood floors in the kitchen and breakfast area, stained wooden doors, casings, baseboards, wainscoting, fireplace mantels, cabinets, crown moldings, and ceiling beams. There is a significant amount of stone surfaces on certain floors, countertops, and fireplaces. The walls appear to be sheetrocked and painted a light color except in a few rooms (*e.g.*, the kitchen and great room) where the paint has a faux finish. Other rooms have carpeted floors, including a very light carpet in the upstairs bedrooms.

2. Defendant Allstate Insurance Company is a company that sells and provides homeowners insurance.

3. Allstate issued a "Deluxe Plus Homeowners Policy" to the Schabers, which was in full force and effect during July and August 2005. *See* Stip. FF ¶ 1.

4. Under "Coverage A" of the Policy, "all risk" coverage was provided for "sudden and accidental direct physical loss" to the Schabers' dwelling, located at 20 Syl Dor Lane. *See* Stip. FF ¶ 2. As noted above, one of the issues presented for trial is whether the Schabers sustained a covered loss to the dwelling under Coverage A.

5. The policy provides that, in the event of a loss covered by the policy, the insured must promptly give notice of the loss to Allstate or to its agent. *See* Stip. FF ¶ 3.

6. David Leslie is the Allstate agent who sold and serviced the policy issued to the Schabers. *See* FF ¶ 4.

7. On July 14 and 19, 2005, the Schabers met with Stanley Costa, the owner of SonoMarin Cleaning Company, Inc. and discussed with him the cleaning of their home. *See* Stip. FF ¶ 5.

8. Mr. Costa has owned SonoMarin for approximately five years. His wife, Nadine Kmetiuk (also known as Mrs. Costa), works for SonoMarin as its cleaning manager and has been in the housecleaning business since approximately 1991. SonoMarin is a diamond-certified cleaning company and has never been accused of damaging the structure of a customer's house.

9. The Schabers hired SonoMarin to come to their home on August 6, 2005, and perform selected cleaning services. *See* Stip. FF ¶ 6.

10. When SonoMarin first arrived at the Schabers' house on August 6, 2005, to perform the cleaning services, the Schabers were present. The Schabers, however, were absent from their home during the time that SonoMarin actually performed work. *See* Stip. FF ¶ 7.

11. The Schabers returned to their home in the evening of August 6, 2005. *See* Stip. FF ¶ 8. At the time, there was still daylight. Ms. Kmetiuk showed the Schabers the cleaning that had been done and pointed out two or three items of personal property that had been damaged during the cleaning. The Schabers went through nearly all the rooms with Ms. Kmetiuk while awaiting the return of Mr. Costa, who appeared about 45 minutes after the Schabers arrived. Mr. Costa was present for a portion of the walk-through.

12. That same evening, the Schabers paid SonoMarin in full for its services ($2,085). The Schabers did not complain about any damage at that time. In fact, both Schabers kissed the check that they gave to Mr. Costa.

13. Several days later, on August 10, 2005, the Schabers met with Mr. Costa to discuss alleged damage caused by SonoMarin. *See* Stip. FF ¶ 9. During the meeting, which lasted for at least one hour (approximately), Mrs. Schaber showed Mr. Costa only three things that were allegedly damaged by SonoMarin: (1) a lampshade, (2) a piece of veneer on her dresser, and (3) a clock in the master bathroom.

14. After several more days passed, on or before August 19, 2005, the Schabers arranged for Mr. Costa to inspect on August 22, 2005, additional alleged damage they discovered. *See* Stip. FF ¶ 10.

15. On or about August 19, 2005, Mr. Schaber telephoned Mr. Leslie and told him that the Schabers' dwelling and personal property had been damaged on August 6, 2005. *See* Stip. FF ¶ 11.

16. On or about August 19, 2005, Mr. Schaber requested that Mr. Leslie come to the Schabers' home on August 22, 2005. *See* Stip. FF ¶ 12. Mr. Leslie agreed to go to the Schabers' home on August 22, 2005. *See* Stip. FF ¶ 13.

17. On August 22, 2005, the Schabers conducted a property inspection, during which Mr. Costa and Mr. Leslie were present. *See* Stip. FF ¶ 14. Everett and LouAnn Martin were also present.[1] *See* Stip. FF ¶ 14. The property inspection lasted for approximately two and a half hours.

18. During the property inspection, the Schabers pointed out alleged property damage to Mr. Costa and Mr. Leslie. *See* Stip. FF ¶ 15. The alleged property damage was extensive, covering virtually all of the house and its contents. Mr. Costa videotaped the inspection. *See* Ex. P (videotape).

19. During the property inspection, the Schabers provided Mr. Leslie with a handwritten itemized list of alleged property damage. *See* Stip. FF ¶ 16.

20. At some point, Mr. Leslie raised with Mr. Schaber the option of pursuing the claim against SonoMarin. The Schabers opted to pursue that claim instead of pursuing a claim against Allstate directly. Mr. Leslie, however, did not inform the Schabers about the advantages and disadvantages of filing a first-party claim with Allstate, nor did he inform the Schabers that the option of pursuing a claim against SonoMarin was not mutually exclusive with filing a claim with Allstate. Mr. Leslie testified that he could not conceive of any advantage of not filing a claim with Allstate; nor could he conceive in his mind why it would be in the Schabers' best interest not to file

---

[1] The Martins appear to be friends or acquaintances of the Schabers.

a claim. Mr. Leslie's compensation as Allstate's agent can be affected by the claims and loss history of his clients.

21. Over the next several months, Mr. Schaber had conversations with representatives of SonoMarin's insurance carrier regarding the damage to the Schabers' home. *See* Stip. FF ¶ 17.

22. During or before October 2005, the Schabers retained attorney Susan Angel to represent them with regard to their claim against SonoMarin for property damage. *See* Stip. FF ¶ 18.

23. On or about June 21, 2006, Ms. Angel wrote to Mr. Leslie requesting the claim number for the claim that Ms. Angel believed had been tendered by the Schabers to Allstate in August 2005. *See* Stip. FF ¶ 19.

24. On June 26, 2006, Mr. Leslie told Ms. Angel by telephone that he had not opened a claim. *See* Stip. FF ¶ 20.

25. The Schabers were aware that no claim had been opened with Allstate. In fact, as late as July 4, 2006, the Schabers did not intend to open a claim with Allstate, either with respect to their dwelling or their personal property, as demonstrated by an e-mail of that date written by Mrs. Schaber. *See* Ex. G (e-mail, dated July 4, 2006, from Mrs. Schaber to attorneys) ("In my letter to you of June 3, 2006, I did ask about the advisability of involving our insurance company, Allstate, to help you with the estimate process, *perhaps without actually filing a claim with them at this stage*.") (emphasis added). Other evidence also demonstrated that the Schabers knew no claim had been opened. For example, the Schabers did not receive a claim number from Allstate even though they had previously filed claims with Allstate on other matters and received claim numbers. The Schabers made no effort to contact Mr. Leslie for nearly ten months, other than sending Mr. Leslie a typewritten list of damaged items some time after the August 22, 2005, inspection. The Schabers conceded that, had a claim been opened with Allstate, they would have expected to hear something back from Allstate within several weeks. Yet they never did until July 2006.

26. On July 6, 2006, Mr. Schaber requested Mr. Leslie to immediately open a claim with Allstate, and Mr. Leslie did so. *See* Stip. FF ¶ 21.

27. Allstate assigned the Schabers' claim to adjuster Stefanie Harris. *See* Stip. FF ¶ 22.

5

28. On July 7, 2006, Ms. Harris informed the Schabers that the alleged damage caused by SonoMarin was not covered. *See* Stip. FF ¶ 23.

29. On July 26, 2006, the Schabers filed a lawsuit against SonoMarin in Marin County Superior Court, seeking recovery on account of the alleged damage to their home and its contents. *See* Stip. FF ¶ 24.

30. On August 11, 2006, the Schabers filed the instant lawsuit against Allstate in Marin County Superior Court, also seeking, *inter alia*, recovery on account of the alleged damage to their home and its contents. *See* Docket No. 1. Allstate removed the case to this Court on the basis of diversity jurisdiction. *See* Docket No. 1.

31. According to the Schabers, virtually every square inch of their house and virtually all of its contents were substantially damaged or destroyed by SonoMarin, and the damage was obvious. For example, the Schabers claimed that the paint on all the walls and ceilings had been scrubbed down to the primer; the woodwork throughout the house (including cabinets, floors, moldings, baseboards, and ceiling beams) had been stripped of its protective finish, exposing the raw wood, and was now lighter in color; and the marble and/or granite floors and countertops had been stripped of their protective finish and the structure of the stone itself had changed as reflected by the change in the color of the stones' veins. The Schabers even claimed that the shellac coating on nearly two dozen oil paintings had been removed, that the finish of a honey dipper and two chopping blocks in the kitchen had been taken down to the raw wood, and that the protective acrylic coating had been removed from the toilet seats and lids in the bathrooms, leaving them rough, dull, and scratchy in appearance and feel. *See generally* Ex. F (list of alleged damage).

32. SonoMarin did not cause any damage to the Schabers' dwelling or its contents.

33. Mr. Costa and his wife, Ms. Kmetiuk, credibly testified that SonoMarin did not clean the walls or the ceilings (other than to get rid of cobwebs) and that SonoMarin used safe products and techniques that have never been problematic in past experience to clean the house and its contents. That SonoMarin did not clean the ceiling or wash the walls is corroborated by the written documentation exchanged with the Schabers. *See* Ex. A at 7-9 (Mrs. Schaber's handwritten instruction that SonoMarin should not wash walls; SonoMarin's pamphlet stating that washing of the

ceilings is not offered as a service); *see also* Ex. B at 2; Ex. C at 2. That documentation also states that SonoMarin does not use any corrosive materials. *See* Ex. A at 9. The testimony of Mr. Costa and Ms. Kmetiuk that SonoMarin did not use a steamer to clean any of the Schabers' house is consistent with the directions given by Mrs. Schaber who is meticulous and not reticent to give directions. The credibility of Mr. Costa and Ms. Kmetiuk is backed by the fact that SonoMarin is diamond certified (which the undisputed testimony establishes is very difficult to obtain) and has never received any prior complaints of a similar nature, despite being in the cleaning business for five years. The Court finds the trial testimony of both Mr. Costa and Ms. Kmetiuk earnest and credible.

   34. Allstate's experts also credibly testified and their testimony was unrebutted by the Schabers. Allstate's construction expert, Martin Raye, credibly testified (1) that his inspection of the house did not reveal any of the damage claimed (*e.g.*, there was no damage to any of the floors, the finish on the woodwork was within industry standards, the paint still had gloss and was not chalky to the touch); (2) that any damage in the house was actually a result of regular "wear and tear" (*e.g.*, the paint in the kitchen was lighter due to exposure to light, woodwork such as on window sills was lighter in color due to sun bleaching, the exterior doors showed signs of water damage at the base which is a common occurrence since rain "sheets down," the damage on the window sills was a result of water damage as evidenced by the pattern of leakage at the corners and the nail locations, the kitchen floor showed wear patterns only in heavy traffic areas and had no signs of water stain or damage (*e.g.*, cupping or warping) as would be expected if it suffered moisture damage from a steamer); and (3) that much of the damage claimed was physically impossible (*e.g.*, he was not aware of any process by which the top layer of paint can be removed from a wall leaving only the primer coat beneath, and that damage from steam was unlikely since wallpaper can be steamed off a wall without causing any damage to the underlying surface). In addition, Allstate's mechanical engineering expert, Roland Huet, testified credibly that the color of marble and granite cannot be changed as a result of steam issued by a cleaning device such as the HydraSteamer. Such damage would require much higher temperatures. The Court finds the testimony of Allstate's expert witnesses credible.

7

35. That there was no damage to the Schabers' house is also substantiated by the testimony of Mr. Leslie, who stated that, with minor exceptions, he did not see any visible signs of damage during the two hour property inspection led by Mrs. Schaber in August 2005. It is also substantiated by the photographs and videos of the house admitted into evidence and reviewed by the Court. Those photographs and videos, *see* Exs. P-T (photographs and videos), show that the finishes on the floors and woodwork were intact (glossy and reflective of light) and that the only visible evidence of damage (*e.g.*, weather wear on the exterior of the front door, fading of window sills exposed to sunlight, damage from water right underneath the master bathroom sink) was the result of wear and tear. The most visible damage is to the wood paneling on the face immediately below one of the master vanities, where it appears that the finish coat has lifted leaving a greyish pattern which contrasts with the unaffected areas which maintain a dark wood finish. *See* Ex. Q at Q36 (photograph). However, based on the pattern of damage, it appears that this damage reflects damage from water dripping from the countertop (which does not have a raised lip to prevent water from spilling over the edge) over time. This is corroborated by the fact that the damage only appears in the area immediately below the sink.

36. The assertions of the Schabers are not credible. According to the Schabers, the entirety of their house, and each room thereof and their contents had, in essence, been destroyed by SonoMarin. The scope of the damage, enough to fill a typewritten list fifteen pages in length of single-space type, *see* Ex. F (list of alleged damage), borders on the incredible.

37. The Schabers provide no credible explanations as to how a house with more than 5,000 square feet and nearly all the furniture and personal property could have been destroyed in just one day, even taking into account the size of SonoMarin's cleaning crew of nine persons (plus Ms. Kmetiuk). Nor is there any explanation as to how the damage alleged could have occurred (*e.g.*, faux paint stripped of its finish coat and lightened, yet maintaining its uniform finish; coats of marine varnish stripped from the wooden exterior door; shellac on oil paintings removed without damaging the paintings themselves; change in the veining and structure of stone, etc). Nor is there any explanation as to how the Schabers' light carpet could have remained pristine and free of even a

8

1  drop of paint or varnish if all of the paint and woodwork finishes throughout the house had been
2  removed as claimed.

3        38.     According to the Schabers, the damage to the house and its contents was not only
4  extensive but also obvious.  Notably, Mrs. Schaber testified that, upon returning to the house, she
5  felt something was "horrifically wrong," that the house was very humid as if one were getting out of
6  a lengthy hot shower, that some items in the house were "actually dripping" with moisture, and that
7  some of the oil paintings had been scrubbed so hard that the canvas was visible where the paint was
8  removed.  But if the damage was so extensive and obvious as claimed, one would have expected the
9  Schabers to have said something to SonoMarin when they returned to the house on August 6, 2005.
10 In fact, the Schabers did not make any complaint to SonoMarin that day, even though they toured
11 the house with Ms. Kmetiuk to review the cleaning job.  Nor did they say anything to Mr. Costa
12 when he arrived that evening.  Indeed, the Schabers actually paid SonoMarin in full for its services,
13 with both Mr. and Mrs. Schaber each kissing the check before giving it to Mr. Costa.  Furthermore,
14 the Schabers did not complain of any damage to the house and instead focused on only minor
15 damage to personal property when they met with Mr. Costa for at least an hour on August 10, 2005.
16 Notably, the wide range of complaints was not made until on or about August 22, 2005, some two
17 weeks after SonoMarin had performed its cleaning services for the Schabers.  Significantly, Mrs.
18 Schaber testified that, during this period of time, she would lay in bed at night and wonder if
19 SonoMarin had caused more damage and, when she got up, she would check and find more damage.
20 As time went on, she discovered more and more damage.  This testimony is inconsistent with the
21 Schaber's claim of extensive, severe, and obvious damage.

22       39.     The Schabers' credibility is also questionable in light of the fact that they did not tell
23 their daughter, Joy, about any damage to the house until, during one of their normal weekly
24 telephone conversations, Joy asked Mrs. Schaber how the housecleaning had gone.  Even then,  Mrs.
25 Schaber simply indicated that she was not happy with the results; she did not ask Joy to come to the
26 house immediately or as soon as possible to view the damage.  Again, this testimony is not
27 consistent with the Schabers' claim of extensive and horrific damage caused on August 6, 2005.
28

9

40.     Nor can the Court credit Joy Schaber's testimony as to the alleged damage. Joy did not visit the house until her regular monthly visit. Although Joy testified, consistent with her parents, that the house had sustained extensive damage, her testimony is not credited since (1) she has a bias (understandably) as the Schabers are her parents; and (2) her knowledge of the house was limited as she did not grow up in it and, although a regular visitor, she was not inspecting the house for damage during those visits. Also, Joy's testimony that she did not see any real wear and tear in the house, which was built back in 1989, is not credible. Having heard the substance of Joy's testimony and observed her demeanor, the Court cannot credit her testimony as to the damage allegedly sustained to the house.

41.     In addition, the Schabers' claims are not credible in light of the evidence that they did *not* present. They did not, *e.g.*, offer any independent third-party witnesses to testify about what the house looked like before and after the cleaning by SonoMarin. Although, in the parties' joint pretrial conference statement, the Schabers identified two family friends, Douglas and Yolanda Godfrey, as witnesses who would provide such testimony, neither of the Godfreys ultimately testified. Nor did the Martins -- the couple who attended the property inspection on August 22, 2005 -- testify. The lack of corroborating witnesses is telling given that, according to the Schabers, they entertained extensively and had many visitors to their house.

42.     Furthermore, the Schabers did not offer any photographs as to what the house looked like before the cleaning so that the Court could have a point of reference to assess the photographs and videotapes of what the house looked like after the cleaning. It is implausible that the Schabers did not have any photographs given the testimony that they purchased the house in part so that they could entertain and display their antiques. In any event, the Schabers produced no objective evidence contrasting the before and after conditions of the house.

43.     Finally, the Schabers failed to provide any expert testimony (1) to support their claim that their house was in fact severely damaged (*i.e.*, not wear and tear) and (2) to explain how the damage claimed could have occurred (*e.g.*, how can paint be uniformly lightened, how can varnish be removed from woodwork leaving only raw lumber, how can shellac from a painting be removed

without harming the underlying paint, how can the color and patterns of natural stone be altered), as a result of cleaning by SonoMarin.

44. In finding the Schabers' allegations of damage not credible, the Court does not necessarily conclude that their testimonies were consciously untruthful. It appears that at some point, once the Schabers were convinced that SonoMarin caused some damage, they began to search for every piece of evidence that tended to affirm their belief and, as a result, the list of damaged items grew larger with time.[2] The fact that the cleaning which eliminated dust and dirt may have changed the appearance of, *e.g.*, woodwork and stone may have contributed to the Schabers' perceptions.

45. In any event, whatever the reason for the Schabers' perceptions, the Court finds that no damage to the dwelling occurred as a result of SonoMarin's activities and that their house sustained no damage on August 6, 2005.

46. Even if SonoMarin did cause any damage to the house, at best, the Schabers would be entitled only to nominal damages. The Schabers failed to present any competent, admissible evidence as to the amount of damages allegedly sustained. Estimates of repair costs obtained by the Schabers were excluded as hearsay. The only evidence as to the dollar value of the alleged damage was Plaintiffs' attempt to have Mrs. Schaber testify as to the loss in value to the home resulting from the damage. The Court, having reserved ruling at trial, sustains Allstate's objection thereto.

47. While federal courts do allow "landowners to give opinion evidence as to the value of their land due to the special knowledge of property which is presumed to arise out of ownership," that is only pursuant to Federal Rule of Evidence 702. *See United States v. 68.94 Acres of Land*, 918 F.2d 389, 397 (3d Cir. 1990) (noting that advisory committee notes for Rule 702 state that the rule

---

[2] The Schabers may have been affected by what psychologists refer to as "confirmation bias." *See* R. Nickerson, "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises," 2 *Rev. of Gen. Pscych.*, 175, 177 (1998) (explaining that people tend to seek information that they consider supportive of favored hypotheses or existing beliefs and to interpret information in ways that are partial to those hypotheses or beliefs; conversely, they tend not to seek and perhaps even to avoid information that would be considered counterindicative with respect to those hypotheses or beliefs and supportive of alternative possibilities (Koriat, Lichtenstein, & Fischoff, 1980)); D. Rothman, *California Judicial Conduct Handbook*, 3rd Edition (California Judges Association), pp. 56-59 (describing the dangers of "cognitive illusions" of judgment caused by "scenario fulfillment" where there is an unconscious attempt to make available evidence fit a preconceived scenario).

11

1 applies not only to "'experts in the strictest sense of the word . . . but also [to] the large group
2 sometimes called "skilled" witnesses, such as . . . landowners testifying to land values'"); *see also*
3 *La Combe v. A-T-O, Inc.*, 679 F.2d 431, 434 n.4 (5th Cir. 1982) (noting that "the testimony of an
4 owner as to the value of his property is admitted under the Federal Rules of Evidence under Fed. R.
5 Evid. 702"). The Schabers did not disclose that Mrs. Schaber would provide any expert testimony
6 until the day that she testified. *See* Fed. R. Civ. P. 26(a)(2) (providing that "a party must disclose to
7 the other parties the identity of any witness it may use at trial to present evidence under Federal Rule
8 of Evidence 702"); Docket No. 21, at 2 (providing for expert disclosure in October 2007). The
9 pretrial disclosures regarding Rule 702 evidence were not complied with by the Schabers, and was
10 thus subject to exclusion. Even if Mrs. Schaber's testimony were considered, whether as expert
11 testimony or lay testimony, it was also excludable because it was speculative. Mrs. Schaber refused,
12 even on questioning by the Court, to clearly state the basis of her opinion other than conceding it
13 was based in part upon her estimates of the cost of repair, not on an overall assessment of the
14 diminution in fair market value of the house. That estimate in turn was largely based on third-party
15 estimates which the Court excluded as inadmissible hearsay and the reliability of which had not been
16 demonstrated. The Schabers' attempt to bring in through the back door inadmissible hearsay
17 evidence of repair estimates provided by third party vendors (none of whom were called to testify at
18 trial) through Mrs. Schaber is not permitted.

19     48.    Furthermore, Mrs. Schaber's estimate of diminished value, if it were based on
20 anything other than estimated cost of repair, is excludable as irrelevant. Under the policy at issue,
21 "actual cash value" is determined with respect to repair/replacement cost, less depreciation. *See* Ex.
22 1, at 16 (defining "actual cash value"); *Cheeks v. California Fair Plan Ass'n*, 61 Cal. App. 4th 423,
23 429 & n.5 (1998) (stating that, if an insurance company "wants to determine 'actual cash value' on
24 the basis of replacement cost less depreciation all it has to do is say so in the policy" and that "[t]his
25 case be accomplished by using words such as "'actual cash value, with proper deduction for
26 depreciation'"). In the context of the policy in this case, it does not mean fair market value.
27 ///
28 ///

## II. CONCLUSIONS OF LAW

1. The Schabers have failed to prove that their house suffered "sudden and accidental direct physical loss" under Coverage A. Therefore, Allstate justifiably denied coverage.

2. At the final pretrial conference and at the trial herein, the Schabers stipulated that, if the Court were to find coverage was justifiably denied, no claim for bad faith delay would lie. Although this Court has concerns with Mr. Leslie's failure to fully inform the Schabers of their right to open a claim with Allstate and the advantages thereof (as well as the disadvantages of not opening a claim), and the fact that Mr. Leslie's compensation as Allstate's agent could be affected by his client's reported loss and claims history, based on the Schabers' pretrial stipulation and given the above conclusion of the Court that the Schabers' claim was justifiably denied by Allstate, no actionable claim of bad faith delay in opening the claim lies against Allstate.

IT IS SO ORDERED.

Dated: March 21, 2008

_____
EDWARD M. CHEN
United States Magistrate Judge